UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
SYLVIA ORTIZ-MOSS,                    :
                                      :
                    Plaintiff,        :
                                      :
          -against-                   :  05 Civ. 4206 (THK)
                                      :
                                      :  **MEMORANDUM OPINION AND**
NEW YORK CITY DEPARTMENT OF           :          **ORDER**
TRANSPORTATION, VICTOR ROSEN,         :
AND VINCENT SUSI,                     :
                                      :
                    Defendants.       :
                                      :
                                      :
------------------------------------X
**THEODORE H. KATZ, UNITED STATES MAGISTRATE JUDGE.**

        Plaintiff Sylvia Ortiz-Moss brings this action against the New
York City Department of Transportation ("DOT"), and her former
supervisors, Victor Rosen and Vincent Susi, alleging gender
discrimination and unlawful retaliation, in violation of Title VII
of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et
seq., 42 U.S.C. § 1983, the New York State Human Rights Law, and
the New York City Human Rights Law.  The parties have completed
pretrial discovery and have consented to trial before this Court,
pursuant to 28 U.S.C. § 636(c).  Presently before the Court is
Defendants' motion for summary judgment.  For the reasons that
follow, the motion is granted.

                          **FACTUAL BACKGROUND**

        Except where otherwise noted, the following facts, derived
from the parties' Statements pursuant Local Civil Rule 56.1, are
undisputed.

The Bureau of Parking, a division of DOT, contains various units, including the Parking Control Unit ("PCU"), which is responsible for writing parking tickets.  There are approximately 75-80 employees in the PCU, primarily in two civil service titles: Parking Control Specialist ("PCS") and Associate Parking Control Specialist, Levels I and II ("Associate PCS").  Individuals holding the PCS title are known primarily by the "in-house" title of "officers."  Those holding the Associate PCS civil service title serve in the "in- house" titles of Captain, Associate Chief, Deputy Chief, and Chief.  In-house titles have no civil service meaning and are merely given to positions for organizational purposes.  In the PCU there are 2-3 Chiefs and Assistant Chiefs, 15-20 Captains, and the remaining employees are officers and clerical staff.

Defendant Rosen is the Assistant Commissioner of the Bureau of Parking, and he has six directors serving directly under him, one of whom is Defendant Susi.  Of the other five directors, three are female and two are male.  Rosen promoted all of the directors to their title.

Plaintiff was employed in the DOT PCU from 1992 until 2006, when the PCU was transferred from DOT to the New York City Police Department ("NYPD").  Plaintiff commenced employment with the PCU as a principal administrative assistant, where she performed administrative services.  In that same year she received a provisional appointment to the civil service title of Staff

2

Analyst.  In 1995, she became Deputy Chief for Administration in the PCU, but her civil service title remained Staff Analyst.  In 1997, Plaintiff became Deputy Chief of Operations in the PCU, and her civil service title remained unchanged.

In 1998, Plaintiff came under the direct supervision of Defendant Rosen.  In April of 1998, Rosen assigned Plaintiff to the position of Chief, PCU, but her civil service title remained Staff Analyst, and her salary remained the same.[1]  From 1998-2000, while under Rosen's direct supervision, Rosen believed that Plaintiff performed her administrative duties well, but that she performed her operational duties only satisfactorily. (See Deposition of Victor Rosen, dated Dec. 12, 2006 ("Rosen Dep."), at 11.)  Rosen rated Plaintiff either "above average" or "outstanding." (See id.)

Local 237 of the International Brotherhood of Teamsters ("L. 237") represents, in collective bargaining, employees in the titles of PCS and Associate PCS, the officers and their supervisors in the PCU.  In November, 2001, L. 237 wrote a letter to Rosen complaining that Plaintiff filed an excessive number of disciplinary charges targeting particular employees, and was routinely rude and displayed disrespect for staff members. (See Exhibit ("Ex.") F to Declaration of Alan M. Schlesinger, dated Sept. 28, 2007 ("Schlesinger Decl.").)

---

[1] Plaintiff contends that at some point her salary was raised from $48,000 to $49,000. (See Deposition of Sylvia Ortiz-Moss, dated Oct. 3, 2006 ("Pl.'s Dep."), at 46.)

Nevertheless, in January, 2002, after Plaintiff took the required civil service test, Rosen promoted Plaintiff from the civil service title of Staff Analyst to the title of Associate Staff Analyst. (See Pl.'s Dep. at 46-47.)

In March, 2002, Defendant Susi, one of the six directors under Rosen, assumed oversight of the PCU. On March 14, 2002, Plaintiff transmitted to Rosen complaints received from supervisors in the PCU claiming that L. 237, which represented supervisors as well as officers, was not adequately protecting their interests due to an alleged conflict of interest. Rosen thought the complaints were very serious and he advised Plaintiff that he forwarded the complaints to DOT's human resources and labor relations officers.

On April 1, 2002, Susi reorganized the PCU, eliminating the Chief, PCU position. Plaintiff was reassigned from the in-house Chief, PCU to the in-house title of Chief of Administration, PCU. Plaintiff's civil service title remained Associate Staff Analyst, and her salary was unchanged. The in-house title of Chief of Operations was filled by David Griffith. The Chief of Administration and Chief of Operations were co-equals. Nevertheless, Plaintiff contends that she was demoted in title and rank.[2] Nobody served as Chief, PCU until October, 2002.

Plaintiff claims that the reorganization and her reassignment

---

[2] According to Susi, the change in position was not a demotion. (See Deposition of Vincent Susi, dated Dec. 12, 2006 ("Susi Dep."), at 17.)

resulted from the complaints about the union's conflict of interest that she received from staff and forwarded to Rosen in March, 2002. According to Susi, when he assumed supervision of the PCU, he observed problems, including low morale and diminished productivity.  He met with officers and captains, as well as union representatives, and found the employees to be "very disgruntled." (Susi Dep. at 18.)  They were dissatisfied with the manner in which Plaintiff treated them, felt that they were over-disciplined, and, in their view, Plaintiff spoke to them in a derogatory fashion. (See id.)   Susi decided to separate the administrative and operations functions, and appointed Plaintiff Chief of Administration because he felt that was where Plaintiff's analytical and report-writing strengths would be best utilized. According to Susi, morale and performance in the PCU improved after the April, 2002 reorganization.[3]

Plaintiff contends that, as a result of her reassignment, she lost the opportunity to put in as much overtime as she had in her prior position, thus reducing her overall compensation.  According to Defendants, Plaintiff was not denied overtime opportunities; instead, her new job had less demanding duties and did not require overtime.  Plaintiff was also relocated to an office, in the training room, which she contends was rat and bug infested and

_____

[3] Plaintiff disputes that the performance of the unit improved, and attributes the takeover by the NYPD to the inadequate performance of the unit.

5

which served as a storage area. When pressed, Plaintiff acknowledged that while she was in the office, she saw insects two or three times. Shortly after complaining about the office, within two or three weeks, Plaintiff was moved to another office.

In October, 2002, Domingo Bones ("Bones") became the Chief, PCU. In the Fall of 2002, Plaintiff became Chief of Training for PCU, a position she held until September, 2006, when the PCU was functionally transferred to the NYPD. She reported to Bones, who, in turn, reported to Susi, and Susi reported to Rosen. As the Chief of Training, Plaintiff's civil service title, salary, and benefits remained the same. Plaintiff contends, however, that she was demoted in favor of a less qualified male — Bones — who became her supervisor.

As Chief of Training, Plaintiff was responsible for training new employees in the PCU. Trainees completed training feedback forms which rated Plaintiff negatively, complained that the training was disorganized, and that Plaintiff talked down and was rude to new employees.

In October 2003, Plaintiff found a pornographic picture on a computer printer which Plaintiff shared with other staff members. As Plaintiff was viewing the picture, Captain Robert Humes, who sent the picture to the printer, took it out of Plaintiff's hands. (See Pl.'s Dep., at 106-07, 113.) The printer was in the office shared by Assistant Chief Hortense Mangaroo and some captains.

6

Plaintiff told Bones that she wanted her own printer because she refused to share a printer to which pornographic material was being sent. She also complained to all of the chiefs, assistant chiefs, and a few captains, about the picture, (see id. at 107-08), but she did not report the picture to DOT's Office of Equal Employment Opportunity ("OEEO"). This is the only pornographic picture Plaintiff saw in DOT's offices.[4]

The picture was reported anonymously to OEEO and a two-month investigation was undertaken. The investigation resulted Bones's removal from the position of Chief, PCU. He was demoted in civil service title for one year, resulting in a diminution of his salary, and was placed on disciplinary probation. He was not permitted to return to the PCU, and was transferred to another part of the Bureau of Parking. Eleven other staff members were also disciplined and a reorganization of the PCU followed.

In late January, 2004, Plaintiff requested that Captain Michael Nurse and Assistant Chief Vasquez assist her in the training functions. Her request was approved. At the same time, Plaintiff expressed the view that, while she did not disagree with

---

[4] Plaintiff saw one cartoon in the office that depicted a man urinating on France. This occurred around the time that France was denying United States airplanes the use of French airspace. The cartoon had not been sent to Plaintiff, but she requested it as "evidence." One other picture, collected in the DOT offices during an investigation, depicted three obese women wearing micro-shorts, with their rear ends displayed. This picture was not sent to Plaintiff, but she saw it when it was confiscated. (See Pl.'s Dep., at 117.)

7

the reorganization of the department, she felt that she had been unjustifiedly removed from the position of Chief, PCU and that for her own sake and that of the unit she thought she should be reinstated as Chief.   Plaintiff contends that the failure to reinstate her to the position was the result of her complaints about the sexually inappropriate material she found at her printer.

Plaintiff's interest in the Chief's position became known to other staff members.  By letter, dated February 4, 2004, L. 237 set forth its opposition to the idea of reappointing Plaintiff Chief, PCU, and enclosed a petition signed by many of the staff employed in the PCU. (See Schlesinger Decl., Ex. F.)  The staff requested no further contact between Plaintiff and the officers,  providing the following reasons: (1) "The dogmatic harassment upon office[r]s; (2) "The brutal manner in which members were addressed"; (3) "The tyrannical [sic] method of improper and personal attacks by way of discipline"; (4) "The targeted method of divisiveness which was prejudicial to good order"; (5) "Misuse of titles to frighten the members as it relates to their job status".

In the Summer of 2004, Plaintiff, as Chief of Training, with the assistance of two captains under her authority, administered training to new officers assigned to the PCU.  In their training evaluation forms, more than a majority of the trainees complained that the instructors needed more training, gave inconsistent instructions, were unstructured, confrontational, and rude. (See

8

Schlesinger Decl., Ex. G.)   In communicating these criticisms to Assistant Commissioner Rosen, Director Susi noted that Plaintiff had verbally attacked Director Watson for issuing the evaluation forms, yelling that he had no right to evaluate her class.   Susi proposed turning over staff training to the DOT Learning Center. (See id.)

In 2005, Carlos Torres was assigned as Deputy Director, supervising, among other things, the PCU.  He performed all of the functions of Chief, PCU, in addition to other functions.   In September, 2006, the PCU was functionally transferred from DOT to the NYPD.  Plaintiff contends that she wanted to remain at DOT, and that there was a "good list" of employees who were permitted to do so, and a "bad list" of employees who were not.   Plaintiff concedes, however, that she never saw such a list and that she merely heard a rumor about the list.

Plaintiff filed a charge of discrimination with the EEOC on August 29, 2004, (see Schlesinger Decl., Ex. I), and the instant action was filed on April 27, 2005.

## DISCUSSION

Plaintiff contends that she was (1) removed from, and subsequently denied, the position of Chief, PCU, (2) denied further promotions, (3) given unfavorable performance evaluations, and (4) subjected to a hostile work environment, because of her gender and in retaliation for complaints she lodged about the pornographic

picture she found.   Defendants now move for summary judgment arguing that (1) many of Plaintiff's claims are time-barred, (2) Plaintiff has not demonstrated a _prima facie_ case of discrimination or retaliation, (3) DOT had legitimate, non-discriminatory reasons for removing Plaintiff from the position of Chief, PCU, and for the other actions Plaintiff claims were discriminatory, and (4) Plaintiff has failed to come forward with adequate evidence to allow a reasonable fact-finder to conclude that Plaintiff worked in an environment that was hostile to women.

I.   Summary Judgment Standards

     Under Rule 56(c) of the Federal Rules of Civil Procedure, a motion for summary judgment may not be granted unless the Court determines that there is no genuine issue of material fact to be tried, and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law.   See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552-53 (1986); Shannon v. N.Y. City Transit Auth., 332 F.3d 95, 98 (2d Cir. 2003).   The burden of demonstrating the absence of any genuine dispute as to material facts rests upon the party seeking summary judgment.   See Weinstock v. Columbia Univ.,  224 F.3d 33, 41 (2d Cir. 2000).   Once a properly supported motion for summary judgment has been submitted, the burden shifts to the nonmoving party to make a sufficient showing to establish the essential elements of the claims on which it bears the burden of proof at

trial.  See Hayut v. State Univ. of N.Y., 352 F.3d 733, 743 (2d Cir. 2003);  Peck v. Pub. Serv. Mut. Ins. Co., 326 F.3d 330, 337 (2d Cir. 2003) (citing Celotex, 477 U.S. at 323, 106 S. Ct. at 2553). The nonmoving party must put forth "specific facts showing there is a genuine issue for trial." Fed. R. Civ. P. 56(e)(2).  A summary judgment "opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986).  The non-moving party may not rest on its  pleadings and rely on mere allegations, denials, conclusory statements, or conjecture to create a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256-57, 106 S. Ct. 2505, 2514 (1986); Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007).  Moreover, "[a] party opposing a motion for summary judgment simply cannot make a secret of his evidence until the trial for in doing so he risks the possibility that there will be no trial." Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985) (quoting Donnelly v. Guion, 467 F.2d 290, 293 (2d Cir. 1972)).

In assessing the record to determine whether there is a genuine issue to be tried as to any material fact, the Court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought. See Anderson, 477 U.S. at 255, 106 S. Ct. at 2513; McClellan v. Smith, 439 F.3d 137, 144 (2d Cir. 2006);

11

Patterson v. County of Oneida, 375 F.3d 206, 219 (2d Cir. 2004).

When a case is fact-intensive and turns on the intent of one party, as employment discrimination cases often do, "trial courts must be especially chary in handing out summary judgment." Chertkova v. Conn. Gen. Life Ins. Co., 92 F.3d 81, 87 (2d Cir. 1996); accord Feingold v. New York, 366 F.3d 138, 149 (2d Cir. 2004); Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000), cert. denied, 530 U.S. 1261, 120 S. Ct. 2718 (2000); Goldman v. Admin. for Children's Servs., No. 04 Civ. 7890 (GEL), 2007 WL 1552397, at *3 (S.D.N.Y. May 29, 2007). The trial court is under a duty in such cases to carefully scrutinize the record for circumstantial evidence that could support an inference of discrimination. See Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1224 (2d Cir. 1994). Nevertheless, even in discrimination cases, "[c]onclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact." Shannon, 332 F.3d at 99 (quoting Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998)); see also Cameron v. Cmty. Aid for Retarded Children, Inc., 335 F.3d 60, 63 (2d Cir. 2003) (quoting Meiri, 759 F.2d at 998). The "salutary purposes of summary judgment — avoiding protracted, expensive and harassing trials — apply no less to discrimination cases" than to other types of cases. Meiri, 759 F.2d at 998; see also Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001) ("It is now beyond

12

cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases.").

> At summary judgment in an employment discrimination case, a court should examine the record as a whole, just as a jury would, to determine whether a jury could reasonably find an invidious discriminatory purpose on the part of an employer. A court is to examine the entire record to determine whether the plaintiff could satisfy his ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff. A motion for summary judgment may be defeated where a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.

Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d 93, 102 (2d Cir. 2001) (internal citations and quotations omitted).

## II.  Time-Bar

_____Defendants argue that all claims asserted by Plaintiff which accrued prior to November 3, 2003 are time-barred.  These include Plaintiff's claim that she was demoted from the position as Chief, PCU in April 2002 and was housed in a substandard area for two weeks upon her demotion.  Plaintiff responds that these claims are not time-barred because they fall within the "continuing violation" exception, and, in any event, they are not time-barred with respect to Plaintiff's claims under the New York State Human Rights Law.

Title VII requires that a plaintiff in New York file an administrative claim within 300 days "after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1); see also Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113, 122 S. Ct.

2061, 2072 (2002); <u>Tewksbury v. Ottaway Newspapers</u>, 192 F.3d 322, 326 (2d Cir. 1999); <u>Quinn v. Green Tree Credit Corp.</u>, 159 F.3d 759, 765 (2d Cir. 1998); <u>Cabrera v. New York City</u>, 436 F. Supp. 2d 635, 642 (S.D.N.Y. 2006); <u>Torrico v. IBM Corp.</u>, 319 F. Supp. 2d 390, 400-01 (S.D.N.Y. 2004).  "A discrete retaliatory or discriminatory act 'occurred' on the day that it 'happened.'" <u>Nat'l R.R. Passenger Corp.</u>, 536 U.S. at 110, 122 S. Ct. at 2070-71.

Plaintiff filed charges with the EEOC on August 29, 2004; thus, any challenges to employment actions that occurred more than 300 days prior to that date, that is before November 3, 2003, are time-barred.  <u>See</u> <u>id.</u> at 113; <u>Figueroa v. City of New York</u>, 198 F. Supp. 2d 555, 562 (S.D.N.Y. 2002); <u>Contes v. City of New York</u>, No. 99 Civ. 1597 (SS), 1999 WL 500140, at *6 (S.D.N.Y. July 14, 1999). These time-barred claims include Plaintiff's claim concerning her reassignment from the Chief, PCU position on or about April 1, 2002, and the office she was relocated to for approximately two weeks when her position was changed.

Plaintiff's contention that these allegedly discriminatory actions fall within the continuing violation exception is of no avail.  The Supreme Court has made clear that reliance on the continuous violation theory is inappropriate with respect to discrete acts of discrimination.

> Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify.  Each incident of discrimination and each retaliatory adverse employment decision constitutes a

14

> separate actionable "unlawful employment practice." [A plaintiff] can only file a charge to cover discrete acts that "occurred" within the appropriate time period.

Nat'l R.R. Passenger Corp., 536 U.S. at 114, 122 S. Ct. at 2073. Indeed, Plaintiff concedes that the alleged acts of discrimination which predate the 300-day limitations period constitute "specific incidents" of discrimination. (See Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Pl.'s Mem."), at 9-10.).) See Kassner v. 2nd Avenue Delicatessen Inc., 496 F.3d 229 (2d Cir. 2007) ("As we have stated previously, a completed act such as a discontinuance of a particular job assignment is not of a continuing nature." (citing Lightfoot v. Union Carbide Corp., 110 F.3d 898, 907 (2d Cir. 1997))).

Reliance on the New York statute of limitations does not yield a different outcome. Under New York law, claims of discrimination must be brought within three years of the adverse action being challenged. See N.Y. Exec. Law § 296; N.Y. C.P.L.R. § 214(2) (McKinney 2003); N.Y.C. Admin. Code § 8-502(d). See also Lightfoot, 110 F.3d at 907 ("A claim under the NYSHRL must then be filed within three years of the alleged discriminatory act.") (citing Murphy v. American Home Prods. Corp., 58 N.Y.2d 293, 305-06, 461 N.Y.S.2d 232, 238-40, 448 N.E.2d 86, 92-93 (1983)); Tishman v. Associated Press, No. 05 Civ. 4278 (GEL), 2007 WL 4145556, at *8 (S.D.N.Y. Nov. 19, 2007) (claims under the New York State and New York City Human Rights Law are subject to three-year statute of

limitations).   Plaintiff's 2002 reassignment and office claims arose on or about April 1, 2002, and this action was not filed until April 27, 2005.   Thus, they are time-barred under New York law as well.

Defendants are therefore entitled to summary judgment on all claims that accrued prior to November 3, 2003.[5]

## III. Disparate Treatment

     A.   Legal Standard

Plaintiff contends that she was denied reappointment to the position of Chief, PCU, and the position was given to a less qualified male when Domingo Bones was removed from the position in 2004.   After Bones was removed from the position of Chief, PCU, the position was left vacant.   Later in 2005, Carlos Torres was appointed to the position of Deputy Director, which is a level higher than the Chief position.   He assumed responsibility for the PCU, in addition to his other duties.   David Griffith was appointed

---

[5] Plaintiff claims that as a result of her reassignment, she lost overtime opportunities and, thus, her salary was diminished. There is no evidence in the record indicating that Plaintiff requested, and was denied, overtime.   As Defendants' assert, and Plaintiff concedes (see Pl.'s Rule 56.1, ¶ 32), the loss of overtime was merely a function of the reduced responsibilities associated with Plaintiff's new position.   It therefore does not stand as an independent claim of discrimination.   Moreover, since claims relating to the transfer to the new position are time-barred, so too are claims relating to the hours required for Plaintiff to perform her new duties, and consequent loss of overtime.   Finally, Plaintiff's reassignment is a race-neutral explanation for the reduced overtime, which has not been rebutted in any way.

to the position of Chief of the PCU in April 2005.

The standards required to prevail on a disparate treatment claim under Title VII are well-established.  Such claims are governed by the burden-shifting analysis developed by the Supreme Court in McDonnell-Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817 (1973).  See, e.g., McPherson v. N.Y.C. Dep't of Educ., 457 F.3d 211, 215 (2d Cir. 2006); Farias v. Instructional Sys., Inc., 259 F.3d 91, 98 (2d Cir. 2001).  Under this framework, the plaintiff must first establish a prima facie case of discrimination. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506, 113 S. Ct. 2742, 2746-47 (1993); McDonnell-Douglas, 411 U.S. at 802, 93 S. Ct. at 1824; McPherson, 457 F.3d at 215.

To establish a prima facie case of race discrimination, "a claimant must demonstrate that: 1) he was within the protected . . . group; 2) he was qualified for the position; 3) he was subject to an adverse employment action; and 4) the adverse action occurred under circumstances giving rise to an inference of discrimination." Terry v. Ashcroft, 336 F.3d 128, 137-38 (2d Cir. 2003) (internal quotations omitted); see also Collins v. N.Y.C. Transit Auth., 305 F.3d 113, 118 (2d Cir. 2002); Roge v. NYP Holdings, Inc., 257 F.3d 164, 168 (2d Cir. 2001).  An alternative means of satisfying the fourth prong is by showing that the position being sought was filled with an individual who is not a member of the plaintiff's protected class. See Farias, 259 F.3d at 98.  A plaintiff's burden

17

is minimal in establishing a prima facie case of discrimination. See Tomassi v. Insignia Fin. Group, Inc., 478 F.3d 111, 114 (2d Cir. 2007) (describing the burden as "de minimis"); Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 174 (2d Cir. 2005).

Once the plaintiff has carried this initial burden, the burden of production then shifts to the defendant to proffer a legitimate, non-discriminatory reason for the challenged employment action. Hicks, 509 U.S. at 506-07, 113 S. Ct. at 2747; Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253, 101 S. Ct. 1089, 1093 (1981); McDonnell-Douglas, 411 U.S. at 802, 93 S. Ct. at 1824. The defendant need not prove by a preponderance of the evidence that the reasons for its actions were not discriminatory, since the burden of persuasion remains with the plaintiff throughout the case; rather, the defendant must simply present clear and specific non-discriminatory reasons for its actions. See Burdine, 450 U.S. at 254-58, 101 S. Ct. at 1094-96.

Finally, once the defendant has presented a legitimate reason for its actions, the presumption of discrimination raised by the plaintiff's prima facie showing "drops out of the picture." Hicks, 509 U.S. at 511, 113 S. Ct. at 2749; see also Joseph v. Leavitt 465 F.3d 87, 90 (2d Cir. 2006). The plaintiff must then be given an opportunity to demonstrate that the defendant's stated reasons are merely a pretext for discrimination. See McDonnell-Douglas, 411 U.S. at 804, 93 S. Ct. at 1825; Burdine, 450 U.S. at 253, 101 S.

18

Ct. at 1093; Patterson, 375 F.3d at 221.

"The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated [against the plaintiff] remains at all times with the plaintiff." Joseph, 465 F.3d at 90 (quoting James v. New York Racing Ass'n, 233 F.3d 149, 153-54 (2d Cir. 2000)).

On a motion for summary judgment, "the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." Stern v. Trs. of Columbia Univ., 131 F.3d 305, 312 (2d Cir. 1997); accord Feingold, 366 F.3d at 152. "[S]peculation alone is insufficient to defeat a motion for summary judgment." McPherson, 457 F.3d at 215 n.4. Unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination, the employer will be entitled to summary judgment. See Joseph, 465 F.3d at 90.[6]

B.  Application

There is no dispute that Plaintiff is a member of a group protected under Title VII, as she is a woman. While Defendants inexplicably argue that Plaintiff cannot prove that she suffered an

_____

[6] The legal standard for claims under the New York State and New York City Human Rights Laws largely parallels that of Title VII. See Mack v. Otis Elevator Co., 326 F.3d 116, 122 n.2 (2d Cir. 2003); Cruz v. Coach Stores, Inc., 202 F.3d 560, 565 n.1 (2d Cir. 2000).

adverse employment action (see Defendants' Amended Memorandum of Law in Support of their Motion for Summary Judgment ("Defs.' Mem."), at 6), being denied the position of Chief, PCU, a position which involved greater responsibility and authority than the position Plaintiff was reassigned to — Chief, Administration, PCU — could reasonably be viewed as an adverse employment action.[7]

Thus, there remains the question of whether Plaintiff was qualified for the position of Chief and whether she has proffered competent evidence tending to show that denying her the position of Chief, PCU occurred under circumstances giving rise to an inference of discrimination.  While one might normally assume that Plaintiff was qualified for the position because she held the position at an earlier time, Defendants argue otherwise because she was removed from the position due to deficiencies in her performance — most particularly, because of numerous complaints about how she treated staff — and staff continued to voice strong objection to her serving once again as Chief.  There is nothing in the record to refute this contention, and, therefore, Plaintiff has not satisfied the requirement of demonstrating a prima facie case of discrimination.  Cf. Thornley v. Penton Publ'g, Inc., 104 F.3d 26,

---

[7] Defendants may take the position that Plaintiff's reassignment was not an adverse employment action because her civil service title and salary remained the same.  Nevertheless, for the purpose of establishing a prima facie case of discrimination, the diminution of Plaintiff's authority can reasonably be considered an adverse employment action.

30 (2d Cir. 1997) ("[A] plaintiff complaining of discriminatory discharge shows 'qualification' by demonstrating satisfactory job performance, in accordance with the particular employer's criteria for satisfactory performance.").

Plaintiff argues that Defendants' justification is a pretext for discrimination because: (1) the position of Chief was given to a less-qualified male; (2) a comment was made referring to Plaintiff as "that woman," (3) Plaintiff was exposed to sexually inappropriate material, and (4) male employees in the department who had been disciplined received promotions, while Plaintiff, who had not been disciplined was not promoted. (See Pl.'s Mem., at 15; Pl.'s Dep., at 174.)[8]

Plaintiff's conclusory assertion that that males employees who were disciplined were promoted, while she was not promoted – even if true – provides no support for Plaintiff's proposition that Defendants' reason for not reinstating her to the position of Chief was a pretext for discrimination.  It ignores the obvious questions of why the male employees were disciplined and what discipline they received, as well as how the discipline related, if at all, to the positions to which male employees were allegedly promoted. Moreover, evidence in the record contradicts the contention.  Bones was removed from the position of Chief, PCU and demoted after he

---

[8] Plaintiff relies upon the same assertions to satisfy the fourth prong of the test for a prima facie case of discrimination.

was disciplined for the dissemination of pornographic material. While Plaintiff believes that some years later Bones was promoted within another division of the DOT — "Authorized Parking" — she has submitted no competent evidence of his promotion, and there is no evidence that he was promoted by the alleged discriminators in this action.  In fact, Plaintiff conceded at her deposition that she knew of no males who remained in their titles in her division after they were disciplined. (See Pl.'s Dep., at 180.)  Plaintiff also acknowledges that Mr. Humes, another employee involved with the pornographic material, was removed from his position, while the others involved in the incident were either fined or penalized by "losing days". (See id. at 115, 119.)

With respect to Mr. Griffith, the individual who became Chief, PCU in 2005, and Mr. Torres, the person who became Deputy Director,[9] Plaintiff conceded, as well, that she had no independent knowledge that either one had previously been disciplined. (See id. at 182-83.)[10]

Moreover, the only support for Plaintiff's claim that both Mr. Griffith and Mr. Torres were less qualified for their positions than she was, is her own opinion.  When asked why she believed that

---

[9] Plaintiff never applied for the position of Deputy Director, but she claims that the position was never posted.

[10] Plaintiff testified at her deposition that Mr. Torres told her that "he did not have a perfect record and that he had disciplinary records against him." (Pl.'s Dep., at 183.)  This hearsay is not competent evidence.

unlawful discrimination was the reason she did not receive the appointment to the position of Deputy Director, Plaintiff's only explanation was "I believe that as a woman I was not treated the same they way they treated the male counterparts," (see id. at 163), and she considered herself the "obvious person to appoint to a position that had anything to do with management of the unit . . . because [she's] the one that is experienced.  Mr. Torres knew nothing." (Id.)  When asked the basis for her opinion that he knew "nothing," Plaintiff responded "merely from his say so." (Id.)

"In determining whether an employee's job performance is satisfactory, courts may - as they often must - rely on the evaluations rendered by supervisors.  After all, job performance cannot be assessed in a vacuum; the ultimate inquiry is whether an employee's performance 'meets his employer's legitimate expectations.'" Meiri, 759 F.2d at 995 (emphasis added) (internal citations omitted) (quoting Huhn v. Koehring Co., 718 F.2d 239, 244 (7th Cir. 1983)).  "[C]ourt[s] must respect the employer's unfettered discretion to choose among qualified candidates." Byrnie, 243 F.3d at 103 (citing, inter alia, Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs., 165 F.3d 1321, 1330 (10th Cir. 1999), cert. denied, 528 U.S. 815, 120 S. Ct. 53 (1999) ("Our role is to prevent unlawful hiring practices, not to act as a 'super personnel department' that second guesses employers' business judgments.") (citations omitted)). See

23

also Williams v. R.H. Donnelley, Corp., 368 F.3d 123, 127 (2d Cir. 2004) (noting that the plaintiff "must show that she met the defendant's criteria for the position").

> When a plaintiff seeks to prevent summary judgment on the strength of a discrepancy in qualifications ignored by an employer, that discrepancy must bear the entire burden of allowing a reasonable trier of fact to not only conclude the employer's explanation was pretextual, but that the pretext served to mask unlawful discrimination. In effect, the plaintiff's credentials would have to be so superior to the credentials of the person selected for the job that 'no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question.'

Byrnie, 243 F.3d at 103 (quoting Deines v. Tex. Dep't of Protective & Regulatory Servs., 164 F.3d 277, 280-81 (5th Cir. 1999)).

There is no competent evidence in the record that would permit a fact-finder to conclude that Plaintiff was more qualified than Griffith and Torres,[11] no less that her credentials were "so superior" that no reasonable person could have chosen Griffith and Torres for the positions of Chief, PCU or Deputy Director of the Bureau of Parking, rather than Plaintiff. Indeed, Plaintiff had been the subject of persistent complaints, by the union and the individuals it represented, for alienating trainees, officers, and supervisors — a "distinction" that was never attributed to Torres and Griffith. A petition had been submitted to management on

---

[11] Although Plaintiff claims, without any competent support for the allegation, that Griffith had been demoted in 2002 due to incompetence, when the PCU was reorganized in 2002, Griffith became the Chief of Operations and Plaintiff became the Chief of Administration, and they were co-equals.

behalf of a large group of employees urging that Plaintiff not be permitted to serve as Chief, PCU again.   Staff found her to be rude, abusive, ineffective as a trainer, and arbitrary in her supervision and treatment of staff.   There is no evidence that this petition was motivated by Plaintiff's gender.   To the contrary, it was signed by both male and female employees who had worked under Plaintiff's supervision.

The only other evidence Plaintiff points to in support of her claim that she was denied a promotion because of sexual discrimination is that, according to Plaintiff, on one occasion, at a meeting, on some unspecified date, at which she was not present, Susi referred to her as "that woman," and, in addition, she had received the single piece of pornographic material.

Neither of these alleged incidents gives rise to an inference of discrimination with respect to the failure to promote Plaintiff. Leaving aside the fact that the alleged reference to "that woman" is rank hearsay, there is absolutely no connection between the remark and the failure to reappoint Plaintiff to the position of Chief, PCU — a position she had been removed from because of widespread complaints about her treatment of other employees.   As for Plaintiff's receipt of a piece of pornography, (1) there is no evidence that she was the intended recipient of the material; (2) it was sent to a printer that was used by other employees, and; (3) none of the people involved with the dissemination of pornography

25

were the decision-makers with respect to denying Plaintiff a promotion, and all of them were disciplined by Plaintiff's supervisors.

In sum, Plaintiff has proffered no evidence which would permit a reasonable fact-finder to conclude that the reasons proffered by Defendants for not promoting Plaintiff were false and a pretext for discrimination.[12]  Accordingly, Defendants are entitled to summary judgment with respect to Plaintiff's claim of gender discrimination.

## IV. Unlawful Retaliation

Plaintiff contends that as a result of her complaining about sexually inappropriate comments and the dissemination of pornographic material, she was denied promotional opportunities and received inaccurate, negative performance evaluations.[13]

### A. Legal Standards

Title VII forbids discrimination against an employee "because

---

[12] Plaintiff never applied for the position of Deputy Director; therefore, Defendants never made any decisions with respect to Plaintiff's qualifications for that position.

[13] Plaintiff also appears to contend that she was removed from the position of Chief, PCU in retaliation for her forwarding employees' complaints about the union to Mr. Rosen. (See Pl.'s Dep., at 68.) As discussed in Section I infra, any claim related to this demotion is time-barred.  In any event, the forwarding of complaints about the union was not protected activity under Title VII, as none of the complaints alleged gender discrimination or any other form of discrimination.  Moreover, Mr. Rosen viewed the complaints as serious and forwarded them for investigation. There is no evidence that he bore any animus to Plaintiff for providing the complaints to him.

he has opposed any practice made an unlawful employment practice .
. . . or because he has made a charge, testified, assisted, or
participated in any manner in an investigation, proceeding, or
hearing" under the auspices of that statute. 42 U.S.C. § 2000e-
3(a); see also Fitzgerald v. Henderson, 251 F.3d 345, 358 (2d Cir.
2001).   As  with  the  burden-shifting  analysis  applied  to
discrimination claims, an employee must first demonstrate a prima
facie case of retaliation, after which a presumption of retaliation
arises.   The  employer  must  then  articulate  a  legitimate,
non-retaliatory reason for the adverse employment action, and the
employee then must show that unlawful retaliation played a part in
the adverse employment action.   See  Jute, 420 F.3d at 173; Cifra
v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001); Quinn, 159
F.3d at 768; Fields v. New York State Office of Mental Retardation
& Developmental Disabilities, 115 F.3d 116, 120-21 (2d Cir. 1997).
In the end, "[t]he ultimate burden of persuasion, of course,
remains with the plaintiff. . . . The critical question is whether
a plaintiff has proven by a preponderance of the evidence that the
defendant intentionally . . . retaliated against the plaintiff for
engaging in protected activity." Sumner v. U.S. Postal Serv., 899
F.2d 203, 209 (2d Cir. 1990) (internal citations omitted).   For an
employment action to be disadvantageous, and thus retaliatory, it
must be of a character likely to dissuade "a reasonable worker from
making  or  supporting  a  charge  of  discrimination."  Burlington

27

Northern & Sante Fe Ry. Co. v. White, 548 U.S. 53, 126 S. Ct 2405, 2409 (2006).

In order to demonstrate a prima facie case of retaliation under Title VII a plaintiff must produce evidence sufficient to permit a reasonable trier of fact to conclude: "(1) that [the plaintiff] engaged in protected [activity] under Title VII . . . (2) that the employer was aware of this activity, (3) that the employer took adverse action against the plaintiff, and (4) that a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action." Kessler v. Westchester County Dep't of Soc. Servs., 461 F.3d 199, 205-06 (2d Cir. 2006) (citing Cifra, 252 F.3d at 216). Although the burden that a plaintiff must meet at the prima facie stage is de minimis, the plaintiff must at least proffer competent evidence of circumstances that would be sufficient to permit a rational finder of fact to infer a retaliatory motive. See Jute, 420 F.3d at 173; Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987). "[P]roof of causation can be shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." Gordon v.

28

New York City Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000).

   B. Application

   The first complaint Plaintiff made about what she considered to be discriminatory conduct was that Domingo Bones, the new Chief, PCU, came into her office in November 2002 and said that he did not know why Susi and Rosen had not gotten rid of her, "you must have their balls in your hands." (Pl.'s Dep., at 94.)   Plaintiff complained to Rosen, who forwarded her complaint to Ann Williams, of the Equal Employment Office ("EEO").   Plaintiff contends that shortly thereafter she was moved into the office that she considered substandard and was infested with roaches and rats.

   As an initial matter, as discussed supra, any claim with regard to Plaintiff's office relocation is time-barred, as it occurred more than three hundred days before Plaintiff filed her EEOC complaint.   Moreover, it is highly doubtful that the relocation to an office which Plaintiff considered substandard, for a period of no more than three weeks, was an adverse job action which would chill a reasonable person's willingness to complain about discrimination.[14]   In any event, Defendants have offered a

--------

   [14] Defendants deny that the office was a substandard storage area. According to Mr. Susi, prior to moving Plaintiff into the office he had it cleaned and vacuumed; Plaintiff's desk and file cabinets were set up; and her computer and telephone line were hooked up. (Susi. Dep., at 36.)  The area was partitioned off from the training room, where Plaintiff performed her training responsibilities, by an accordion wall.  According to Susi, the entire building had roaches, and they were not confined to Plaintiff's office. (See id. at 37-38.)

non-retaliatory reason for relocating Plaintiff's office; the relocation was authorized by Susi — a supervisor about whom Plaintiff had not lodged a complaint — because Bones had assumed the position of Chief, PCU and the Chief's office was given to him.[15] (See id. at 35.) Plaintiff has come forward with no evidence that would permit a reasonable finder of fact to conclude that her office was changed because she complained about a crude remark Bones had made.

The next protected activity Plaintiff claims to have participated in is her complaint to various supervisors about the piece of pornographic material she found at a printer located in other staff members' office. The picture had been reported anonymously to the EEO Office, which undertook an investigation. As part of the EEO investigation, Plaintiff was questioned. As discussed, the investigation resulted in Bones's removal from the position of Chief, PCU, and the disciplining of eleven other employees.

The Court will assume that Plaintiff engaged in protected activity when she spoke to the EEO Office about the pornography, although she did not lodge a complaint herself and she was not the only one interviewed about the matter. Nevertheless, Plaintiff contends that she was retaliated against for cooperating with the

---

[15] Plaintiff does not claim that she was replaced by Bones in retaliation for any protected activity.

EEO Office, by Susi, Rosen, Torres, and Griffith, none of whom were involved in the pornography incident.

The first act of retaliation Plaintiff alleges is the appointment of Carlos Torres as Deputy Director. (See Pl.'s Dep., at 126.) However, Torres was not appointed Deputy Director until sometime in 2005, more than a year after the October 2003 pornography incident. Moreover, Plaintiff had not even applied for the position of Deputy Director. There is simply no evidence of a causal connection between Plaintiff's cooperating with the EEO Office and her not being promoted to Deputy Director. While temporal proximity between protected activity and an adverse job action can demonstrate a causal nexus, see Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 95 (2d Cir. 2001), cert. denied 534 U.S. 951, 122 S. Ct. 348 (2001)(citing Manoharan v. Columbia Univ., 842 F.2d 590, 593 (2d Cir. 1988)), the proximity must be close, see Cifra, 252 F.3d at 217 (citing Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1178 (2d Cir. 1996)). Here, there was more than a year between when Plaintiff was interviewed by the EEO Office and when Torres was appointed Deputy Director. This is insufficient to establish a causal connection. See Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273, 121 S. Ct. 1508, 1510-11 (2001) (citing cases which hold that three and four-month periods between the protected activity and the adverse action are insufficient to establish a causal connection, when temporal proximity is the only

evidence of causality).

Plaintiff also contends that in retaliation for cooperating with the EEO Office, she was denied a promotion back to the position of Chief, PCU. Again, there is nothing linking the denial of the promotion to protected activity engaged in by Plaintiff, other than her subjective belief. As discussed above, Defendants declined to reinstate Plaintiff to the Chief's position because of the numerous, vociferous complaints lodged against Plaintiff by staff members, other supervisors, and the union. There is no evidence in the record that would permit a reasonable fact-finder to conclude that Defendants' explanation for their conduct was merely a pretext for retaliating against Plaintiff for her cooperation with the EEO Office into its investigation of pornography. With respect to the issue of promotion, therefore, Plaintiff has failed to establish a prima facie case of retaliation and, in any event, she has not come forward with any evidence that would permit a reasonable fact-finder to conclude that Defendants' explanation for their conduct is a pretext for retaliation.

Plaintiff also contends that she received inaccurate and unsatisfactory job evaluations in 2003, 2004, and 2005, in retaliation for her complaint about the pornographic material.[16]

---

[16] She also contends that her 2002 job evaluation was inaccurate, but she fails to point to any protected activity that preceded the evaluation and, in any event, this claim is time-barred, as it occurred more than three hundred days prior to Plaintiff's EEOC complaint.

Plaintiff contends that her ratings went from "outstanding" to "good", and that she was not given tasks and standards that would have justified her 2003 and 2004 evaluations. (See Pl.'s Dep., at 135-41.)

As an initial matter, Plaintiff has failed to place in the record any of the evaluations she claims were retaliatory.  Thus, there is nothing in the substance of the evaluations that Plaintiff points to, which the Court can consider competent evidence, in support of her claim that her evaluations did not accurately reflect her job performance.[17]   Indeed, there is some question whether Plaintiff's "good" evaluations were sufficiently adverse so to "chill" the exercise of protected activity.[18]  Although Plaintiff claims that they restricted her ability to be promoted, and that she lost advancement opportunities because of the evaluations, she concedes that she did not apply for any other positions, even though interviews were offered.  Cf. Alfano v. Costello, 294 F.3d 365, 376 (2d Cir. 2002) ("Several [alleged acts of hostile work environment harassment] must be removed from the equation at the

_____

[17] Plaintiff also claims that it was inaccurate for her supervisor to criticize her for "minding management's business" and "telling them what to do." (See Pl.'s Dep., at 146.)  She also takes issue with inconsistent statements in one of her evaluations regarding whether she did or did not have staff to support her training function. (Id. at 152.)

[18] As Defendants' argue, Plaintiff's receipt of a "good" evaluation in 2004 — after management had received numerous complaints about how she treated staff and her inadequate training methods — should be viewed as an act of generosity.

outset because they support no inference of mistreatment. Two are the 'good' evaluations (rather than 'excellent') given in . . . January 1992. Although Alfano cites these disappointing ratings as 'abuse' that was 'nonsexual in nature but was nonetheless directed towards Alfano because of her sex,' she has pointed to no resulting disadvantage or adverse effect on her job performance.").

More importantly, other than Plaintiff's claim that the evaluations were retaliatory, and the fact that they occurred at various times after she was interviewed about the pornographic material, Plaintiff points to no causal connection between her protected activity and the evaluations.  Plaintiff contends that her 2002, 2003, 2004, and 2005 evaluations were all retaliatory. The 2002 evaluation, done by Mr. Susi, preceded any protected activity by Plaintiff, and, thus, there can be no causal connection between that evaluation and unlawful retaliation.  The 2003 evaluation was done by Mr. Bones, and it was expunged because Plaintiff argued that she had not been provided tasks and standards on which to be evaluated. (See Pl.'s Dep., at 136-38.)  Having been expunged, the evaluation had no adverse impact on Plaintiff.  The 2004 and 2005 evaluations were done by Mr. Torres and Mr. Susi. (See Pl.'s Dep., at 151.)  Those evaluations were provided to Plaintiff more than two years after she allegedly complained about the pornography.  The remoteness in time between the evaluations and Plaintiff's alleged protected activity, combined with the fact

that the evaluators were not the subjects of the complaint about the pornography, precludes a reasonable person from finding that there was any causal connection between Plaintiff's protected activity and the evaluations. See <u>Clark County Sch. Dist.</u>, 532 U.S. at 273, 121 S. Ct. at 1510-11, and cases cited therein.

Finally, Plaintiff contends that after she and the majority of personnel in the Parking Control Bureau were transferred to the New York City Police Department, she was placed on a "bad list" and the retaliation continued. (<u>See</u> Pl.'s Dep., at 195.)  No reasonable fact-finder could conclude that Plaintiff has established a <u>prima facie</u> case of retaliation with respect to this allegation. Plaintiff's only support for this contention is that there were "rumors" of a "good list" and "bad list." (<u>See</u> <u>id.</u>)  This is sheer conjecture. Moreover, Plaintiff fails to state with any specificity who retaliated against her at the police department, what form the retaliation took, and how it was causally related to any protected conduct she engaged in while at the Parking Control Bureau, years earlier.   In fact, there are no individuals at the police department who have been named as defendants in this action.

      In conclusion, Plaintiff has failed to demonstrate a <u>prima facie</u> case of retaliation, and, in any event, she has failed to come forward with any competent evidence demonstrating that the legitimate business reasons offered by Defendants for their conduct were false and merely a pretext for retaliation.  Accordingly,

Defendants are entitled to summary judgment on Plaintiff's retaliation claim.

V.    Hostile Work Environment

Plaintiff contends that she was subjected to a hostile work environment, in violation of Title VII.

A plaintiff asserting a hostile work environment claim under Title VII must produce evidence that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Sys. Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 370 (1993) (internal citation and quotations omitted); accord Demoret v. Zegarelli, 451 F.3d 140, 149 (2d Cir. 2006); Cruz, 202 F.3d at 570; Brennan v. Metro. Opera Ass'n, 192 F.3d 310, 318 (2d Cir. 1999). "Isolated incidents typically do not rise to the level of a hostile work environment unless they are 'of sufficient severity' to 'alter the terms and conditions of employment as to create such an environment.'" Demoret, 451 F.3d at 149 (quoting Patterson, 375 F.3d at 227).

Moreover, a plaintiff must demonstrate that the conduct which is alleged to have contributed to the hostile work environment was related to the plaintiff's membership in a protected class. See Brennan, 192 F.3d at 318.  Otherwise, it is not actionable under Title VII. See Pronin v. Raffi Custom Photo Lab, Inc., 383 F.

Supp. 2d 628, 634 (S.D.N.Y. 2005).   Federal anti-discrimination statutes are not to serve as "general civility code[s]." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81, 118 S. Ct. 998, 1002 (1998).

    "The test for determining whether a workplace is a hostile work environment has both subjective and objective elements." Hill v. Rayboy-Brauestein, 467 F. Supp. 2d 336, 359 (S.D.N.Y. 2006). See also Hayut, 352 F.3d at 745.  "The victim must . . . subjectively perceive that environment to be abusive." Alfano, 294 F.3d at 374 (citing Harris, 510 U.S. at 21, 114 S. Ct. at 370). As for whether the workplace environment is objectively abusive, the determination of whether a series of actions constitutes a hostile work environment "is not, and by its nature cannot be, a mathematically precise test." Harris, 510 U.S. at 22, 114 S. Ct. at 371; accord Richardson v. N.Y. State Dep't of Corr. Servs., 180 F.3d 426, 439 (2d Cir. 1999).  "The matter of whether the conduct alleged was so 'severe or pervasive' as to create 'an objectively hostile or abusive work environment, is to be decided based on the totality of the circumstances, in light of such factors as the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Patterson, 375 F.3d at 227 (quoting Harris, 510 U.S. at 22-23, 114 S. Ct. at 371); accord Demoret, 451 F.3d at 149.

Finally, if "reasonable jurors could disagree as to whether alleged incidents of . . . harassment would have adversely altered the working conditions of a reasonable employee, the issue of whether a hostile work environment existed may not properly be decided as a matter of law." Patterson, 375 F.3d at 227.

While Plaintiff clearly believed that her work environment was hostile, she has failed to put forth sufficient evidence that would permit a reasonable fact-finder to conclude objectively that she was subjected to a hostile work environment. She points to few, if any, incidents that were overtly sexually hostile. The most significant incident which Plaintiff relies upon is her discovery of a single piece of pornographic material in October 2003. That material was neither sent to her, nor posted publicly so as to be visible to Plaintiff or any other women.[19] Rather, it was found at a printer shared by a group of people, and was quickly taken out of Plaintiff's hands — strongly suggesting that it was not intended for public viewing. Moreover, there can be no dispute that Plaintiff's employer took prompt action in investigating the

_____

[19] A plaintiff need not be the recipient of sexually offensive material for it to contribute to a hostile work environment. Nevertheless, if the material is not publicly displayed or disseminated, and is not something female employees are generally aware of, its contribution to a hostile work environment may be negligible. Cf. Patane v. Clark, 508 F.3d 106, 114 (2d Cir. 2007) (plaintiff's regular observation of male employee watching pornographic videos, and her being required to handle pornographic material herself in opening supervisor's mail, were relevant to assessing whether her work environment was objectively hostile to women).

incident and disciplining those responsible.  For purposes of this analysis, however, the Court will consider Plaintiff's discovery of the piece of pornography to have contributed to a sexually hostile environment.

Plaintiff also refers to a cartoon she received in which a man was depicted urinating on France; this occurred around the time when post-9/11 American hostility to France was at its height, because France opposed the invasion of Iraq and had denied the United States access to its airspace.  The cartoon was forwarded to Plaintiff at her request.  Whether or not she was offended by the cartoon, it had a political, rather than sexual, connotation, and was not demeaning or inherently objectionable to women.

The only other facially sexual incident Plaintiff relies upon is the statement Bones made to her after she had been replaced as Chief, PCU and appointed Chief of Administration.  According to Plaintiff, Bones stated that he did not know why Rosen and Susi had not gotten rid of her, and that she "must have their balls in her hands." (Pl.'s Dep., at 94.)  This occurred in the Fall of 2002. While this may not have been any more than Bones's crude way of describing the power he thought Plaintiff exercised over Rosen and Susi, the Court will assume it to be sexually hostile.

These are the only incidents relied upon by Plaintiff, during the three-year period from 2002 through 2005, which, on their face, could be taken as disparaging or hostile to women.  Viewed

collectively, they are too few and too minor to meet the "severe or pervasive" standard of a hostile work environment. See, e.g., Quinn, 159 F.3d at 768 (where plaintiff alleged two acts of harassment — a reference to her posterior and the deliberate touching of her breasts with some papers held in the hand of an alleged harasser — court concluded that while offensive and inappropriate, "they are sufficiently isolated and discrete that a trier of fact could not reasonably conclude that they pervaded [plaintiff's] work environment. Nor are these incidents, together or separately, of sufficient severity to alter the conditions of [plaintiff's] employment without regard to frequency or regularity").[20]

Plaintiff further contends that the relocation of her office to a substandard space for a period of two weeks, her allegedly inaccurate performance evaluations, and her alleged exclusion from staff meetings, further contributed to the hostile work

---

[20] In addition, there is no basis to impute the alleged harassment to Plaintiff's employer. See Mack, 326 F.3d at 122 ("To survive a motion for summary judgment, a plaintiff claiming he or she was the victim of an unlawful hostile work environment must elicit evidence from which a reasonable trier of fact could conclude (1) that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of [his or] her work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile work environment to the employer.") (emphasis added) (internal quotation marks omitted). None of the harassing conduct is attributed to Plaintiff's supervisors — Rosen and Susi — and when they were informed of the pornography incident they undertook a thorough investigation and disciplined those involved.

environment.  There is nothing in the record that suggests that any of these conditions of Plaintiff's employment were in any way related to her gender; indeed, as discussed in detail earlier, Defendants have demonstrated that they had legitimate gender-neutral reasons for  the evaluations Plaintiff received and for the need to relocate her office.[21] See Demoret, 451 F.3d at 149-50 ("We must also consider the extent to which the conduct occurred because of plaintiff['s] sex."); see also Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 605 n.5 (2d Cir. 2006) ("[T]o the extent that the plaintiff relies on facially neutral incidents to create the quantum of proof necessary . . . she must have established a basis from which a reasonable fact-finder could infer that those incidents were infected by discriminatory animus").  Moreover, "there is nothing in the record to indicate that the environment [Plaintiff] faced was so severe as to be abusive."  Demoret, 451 F.3d at 150.

In sum, construing the facts in a light most favorable to Plaintiff, no reasonable juror could conclude that Plaintiff's work environment was permeated with intimidation, ridicule, or other forms of harassment based on Plaintiff's gender.  Accordingly,

---

[21] Plaintiff also claims that when Assistant Chiefs and Captains came to her office to speak to her, they were interrogated, harassed, and had their overtime cut.  Other than Plaintiff's speculating about this matter, there is no competent evidence in the record that indicates that staff who spoke to Plaintiff were harassed, no less that any of this alleged conduct was in any way related to Plaintiff's gender.

41

Defendants are entitled to summary judgment on Plaintiff's hostile work environment claim under Title VII.

Plaintiff's New York state-law hostile work environment claim is governed by the same standards as claims under Title VII. See id, 451 F.3d at 152-53. Defendant is therefore entitled to summary judgment on that claim as well.

There is some disagreement as to whether the same standards apply to claims of hostile work environment under the New York City Human Rights Law. There has been a recognition that under the 2005 amendment of that statute, the New York City Human Rights Law is, in certain respects, meant to be more protective than the parallel federal and state statutes. See Farrugia v. North Shore Univ. Hosp., 13 Misc. 3d 740, 747, 820 N.Y.S.2d 718, 724 (Sup. Ct., N.Y. Cty. 2006); Selmanovic v. NYSE Group, Inc., No. 06 Civ. 3046 (DAB), 2007 WL 4563431, at *4 (S.D.N.Y. Dec. 21, 2007); Ochei v. Coler/Goldwater Mem'l Hosp., 450 F. Supp. 2d 275, 282-83 (S.D.N.Y. 2006). Thus, several trial courts have concluded that once a plaintiff shows that she belongs to a protected group, was subjected to unwelcome sexual harassment, and that the harassment complained of was based on her sex, she is not required to demonstrate that the harassment was sufficiently severe or pervasive. "Under the City's law, liability should be determined by the existence of unequal treatment and questions of severity and frequency reserved for consideration of damages." Farrugia, 13

Misc. 3d at 748-49, 820 N.Y.S.2d at 725; <u>accord</u> <u>Selmanovic</u>, 2007 WL 4563431, at *4.  Scant authority is cited for this standard, and it is difficult to discern how to sensibly apply it to a hostile work environment claim, which is not based on unequal treatment. Moreover, the Second Circuit has not yet recognized such a distinction in the coverage of the New York City Human Rights Law, <u>see</u> <u>Ferraro v. Kellwood Co.</u>, 440 F.3d 96, 99, 100-03 (2d Cir. 2006), and the Court is unaware of any New York appellate courts doing so either.

In any event, with pretrial discovery completed and Plaintiff's only evidence of a sexually hostile environment being a single offensive remark and a piece of pornography found at a printer (which was investigated and for which discipline was imposed), over the course of more than a three-year period, there is no basis for a reasonable fact-finder to conclude, even under a more liberal reading of the New York City statute, that Plaintiff was subjected to a hostile work environment on the basis of her gender.

Accordingly, Defendants are entitled to summary judgment with respect to Plaintiff's hostile work environment claim under the New York City Human Rights Law.

VI.  <u>Section 1983 Claim</u>

Plaintiff contends that she was denied her right to equal protection under the Fourteenth Amendment, and seeks, pursuant to

42 U.S.C. § 1983, to establish liability against her two supervisors, Defendants Rosen and Susi, as well as against the City of New York.   Plaintiff's equal protection claim appears to be premised upon the same factual allegations as are offered in support of her claim of unlawful discrimination and retaliation. (See Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, at 1 n.1, 23.)

_____  As discussed, there is no evidence in the record indicating that Plaintiff was treated more harshly than other, similarly-situated male employees, whether or not they had complained about discrimination.  In essence, Plaintiff contends that she was denied a promotion to the position of Chief, PCU, while male employees who had been disciplined received promotions.  She fails, however, to point to anyone in a comparable situation to her who received a comparable promotion.  There is no one who, like Plaintiff, was removed from the position of Chief, PCU because of frequent, vehement complaints from staff and the union about his or her performance, who was then promoted back into the position.

Bones, who had been given the position of Chief, PCU, was removed from the position after he was implicated in the viewing and/or dissemination of pornographic material.  Whether or not he subsequently received promotions in another division of the DOT is irrelevant.  He did not apply for, and did not receive a promotion back into the position of Chief, PCU, from which he had been

removed.   Similarly, there is no competent evidence in the record indicating that other male employees who had been disciplined received promotions.   But, even if they did, it would not demonstrate an inequality in Plaintiff's treatment.  As an initial matter, Plaintiff was not disciplined because of her mistreatment of staff.   She was simply given a different position, albeit somewhat less senior, where she was not required to interact with the staff she had deeply alienated.[22]   Plaintiff can point to no other employee who was removed from a position because he was not found competent to fulfill its responsibilities, who was then promoted back into the position.

Because there is no evidence in the record that would permit a reasonable finder of fact to conclude that Plaintiff's equal protection rights were violated, Defendants are entitled to summary judgment on Plaintiff's Section 1983 claim.

## CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment is granted and this case is dismissed with prejudice.   The Clerk of the Court shall enter judgment for Defendants.

So Ordered.

---

[22] Plaintiff's salary was unchanged, as was her civil service title.

45

THEODORE H. KATZ
UNITED STATES MAGISTRATE JUDGE

Dated:    April 7, 2008
          New York, New York